UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LOUIS HUBRECHT,                          :

                Petitioner,        :        **REPORT AND**
                                                                **RECOMMENDATION**
    - against -                     :        **TO THE HONORABLE**
                                                                **RICHARD J. HOLWELL**
                                         :

DALE ARTUZ, et al.,                      :        05 Civ. 5861 (RJH)(FM)

                                         :

             Respondent.        :

-------------------------------------------------------x

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  _1/25/08_____ |

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

      Petitioner Louis Hubrecht ("Hubrecht") brings this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction on one count of Murder in the Second Degree following a jury trial in Supreme Court, New York County.  The charges against Hubrecht arose out of an incident in which he shot and killed a tenant in his apartment building.  On April 30, 2002, Justice Harold Beeler, before whom the case was tried, sentenced Hubrecht to a prison term of twenty years to life.

      In his habeas petition ("Petition" or "Pet."), Hubrecht claims that he:  (a) was improperly denied a justification jury charge; (b) should have been permitted to introduce evidence supporting his justification defense; and (c) was entitled to introduce

his exculpatory statements into evidence to rebut a false impression created by the prosecutor that he had never told anyone that he acted in self-defense.

For the reasons that follow, the Petition should be denied.  Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Hubrecht should be denied a certificate of appealability because he has failed to make the necessary showing of the denial of a constitutional right.

II.    Background

    A.    Trial

        1.    People's Case

The People's proof at trial would have permitted a reasonable juror to find as follows:

Since the 1930s, the Hubrecht family had owned a six-story building located at 700 Madison Avenue and the attached building at 698 Madison Avenue in Manhattan.  (T. 95-98, 202-03, 2374; Pet'r's Mem. at 3).[1]  In the 1970s, Hubrecht became the sole owner of both buildings.  (T. 98).  He also lived in a third-floor apartment at 700 Madison Avenue.  (Id. at 95, 100).  Barbara Kenna ("Kenna") moved into a sixth-floor apartment in that building in the late 1960s.  (Id. at 117).  By 2000, only Hubrecht, his sister Alice Walker ("Walker"), Kenna, and another tenant, Louise Duncan ("Duncan"),

_____

[1]    "T." refers to the trial transcript.  "S." refers to the sentencing minutes.  "Pet'r's Br." refers to Hubrecht's brief on appeal.  "Pet'r's Mem." refers to Hubrecht's memorandum of law in support of his petition.  (Docket No. 2).  "Ex. A" refers to a separately-bound portion of the Respondent's Appendix.  "Resp't's Mem." refers to the Respondent's memorandum of law in opposition to the Petition.  (Docket No. 9).

resided in that building which originally had seven or eight units.  (<u>Id.</u> at 94, 96, 100-01, 106, 211).  Hubrecht's older sister, Valerie Tresnowske ("Tresnowske"), lived nearby. (<u>Id.</u> at 97).

           Kenna believed that Hubrecht was repeatedly breaking into her apartment, rearranging its contents, and stealing such items as umbrellas, lingerie, books, and wine. (<u>Id.</u> at 190, 1625-27, 1773-74).  In 1990, she installed a sophisticated alarm system.  (<u>Id.</u> at 313-14, 328-31, 334-35).  Thereafter, although the alarm never was triggered, Kenna often contacted John Marchetti ("Marchetti"), the district manager of ADT Security Systems, to discuss her fear that someone was entering her apartment.  (<u>Id.</u> at 313, 337-39, 341, 348-49, 351).  Kenna's fear of intrusions also led her to carry many of her personal belongings with her in a luggage cart whenever she left her apartment.  (<u>Id.</u> at 119-20, 216-17).  She could be heard dragging the luggage cart up and down the uncarpeted stairs of the building each day.  (<u>Id.</u> at 119-20, 216-17).

           Kenna and Duncan both lived in rent-controlled apartments.  (<u>Id.</u> at 98, 180).  Not surprisingly, Hubrecht and his sisters therefore wanted them to move elsewhere.  (<u>Id.</u> at 127, 129-30, 133-34, 237-38).  In or around 1998, Duncan received a "flurry of notes" from Hubrecht suggesting that she would be happier if she moved.  (<u>Id.</u> at 127, 129).  Additionally, in the spring of 2000, Tresnowske offered to pay Kenna to vacate her apartment.  (<u>Id.</u> at 133-34).  Neither woman left.  (<u>Id.</u> at 129, 133-34, 139).

           In May 2000, Hubrecht served Kenna with a "Notice Terminating Tenancy" which relied on six grounds, including her false accusations that he had stolen her

property and the damage that the building allegedly sustained from her use of the luggage cart.  (<u>Id.</u> at 1220-22).  No further action was taken after Kenna hired an attorney to respond to the Notice.[2]  (<u>Id.</u> at 1227-32).

In August 2000, after not having paid her ADT bill for over a year, Kenna signed a new contract to reactivate and upgrade her security system.  (<u>Id.</u> at 330-31, 358-59, 361).  On August 30, 2000, Hubrecht sent ADT a letter requesting information about Kenna's security system, explaining that his approval was required because he was her landlord and the owner of the building.  (<u>Id.</u> at 321-24).  Marchetti responded in writing on September 7, 2000, that ADT could not reveal information about the alarm system without Kenna's consent; a copy of his letter was sent to Kenna.  (<u>Id.</u> at 324-26).

Kenna was a school teacher in Chinatown.  (<u>Id.</u> at 118-19, 293).  She consequently left for work each weekday morning between 7:45 and 8:10 a.m., and returned home each night between 10 and 11 p.m.  (<u>Id.</u> at 119, 121).  On the morning of September 11, 2000, ADT's records show that she left her apartment at approximately 8:05 a.m.  (<u>Id.</u> at 319-21).  At 9:23 a.m., Michael Benny ("Benny"), an emergency medical technician ("EMT"), received a radio call that there was a gunshot victim at 700 Madison Avenue.  (<u>Id.</u> at 372, 376, 460).  When he arrived two minutes later, Hubrecht was holding open the building's entrance door.  (<u>Id.</u> at 377-80, 464).  As Benny

---

[2]   Approximately one year after the shooting, Hubrecht entered into an agreement with an investment group which leased 700 Madison Avenue for forty-nine years in exchange for a $7,250,000 lump sum rent payment to Hubrecht, and the group's assumption of all real estate taxes and operating expenses for the lease term.  (T. 1118-21).  The investment group sought to relocate any existing tenants by 2003.  (<u>Id.</u> at 1130).

approached the building with his partner, he asked Hubrecht if someone had been shot.
(Id. at 380-83).  In response, Hubrecht admitted that he had shot his neighbor, stating that
the gun was upstairs.  (Id. at 380-84).  Hubrecht spoke calmly, explaining that he had
"mental problems" and that Kenna "keeps harassing us, so I shot her."[3]  (Id. at 383-84,
388, 495, 497, 502-03, 553, 560).

Benny found Kenna's body on the third floor landing directly outside
Hubrecht's apartment.  (Id. at 391-92).  Although Kenna was right-handed, she had a
claw hammer in her left hand; her luggage cart was on the landing in front of Hubrecht's
door.  (Id. at 296-97, 391-92, 396-98, 402-06, 516).  Inside Hubrecht's apartment,
Tresnowske was pacing back and forth.  (Id. at 402, 407-09, 545).  Tresnowske had
received a telephone call from someone in Walker's apartment at 8:15 that morning.  (Id.
at 697-98).  After Tresnowske stated that Hubrecht had "psychiatric problems," Benny
directed her to go downstairs.  (Id. at 408-09, 551, 553-55).

Sergeant Reginald Henry ("Henry") and Officers Gonzalez, Wong, and
Mejias of the Police Department responded to the scene shortly after the EMTs arrived.
(Id. at 704-07, 854-56).  The officers initially ran into the building past Hubrecht and
Tresnowske, who had opened the door for them.  (Id. at 416, 707-10, 738, 748, 856-57).
After an EMT identified Hubrecht as the shooter, the officers ran back downstairs and

---

[3]     Prior to Benny's testimony, Hubrecht's counsel argued that it was improper for
the prosecution to adduce this statement without establishing that Hubrecht also had told the
"911" operator only a few minutes earlier that he "had to shoot her because of the hammer."  (T.
365-71).

handcuffed both Hubrecht and Tresnowske, who were placed into separate police cars.[4] (Id. at 712-13, 743, 860-62, 876-80, 1447).

Although Kenna's body was found outside Hubrecht's apartment, the police later recovered the murder weapon, a .38 caliber revolver, inside the apartment.  (Id. at 1460-61, 1466-67).  Also inside the apartment were Kenna's luggage cart, which was filled with bags of papers and personal items;[5] several video surveillance monitors; and four still surveillance camera photographs depicting Kenna with her luggage cart on Madison Avenue outside the building.  (Id. at 1466-72, 1480, 1538-39).

Dr. Karen Turi ("Dr. Turi"), a forensic pathologist employed by the Office of the Chief Medical Examiner, performed an autopsy on Kenna's body.  (Id. at 766, 772-73).  Her autopsy established that Kenna was 69 years old, 5' 3" tall, and weighed 129 pounds.  (Id. at 784).  Kenna had sustained six "closely-associated" gunshot wounds to her chest.  (Id. at 784-85, 788).  The path of each bullet was from front to back and downward.  (Id. at 791, 804).  Based on the stippling patterns[6] on Kenna's body, Dr. Turi

---

[4]     Later, at the Nineteenth Precinct, Hubrecht was interviewed by both a police detective and a prosecutor.  (Pet'r's Br. at 33-34).  During both interviews, Hubrecht claimed that he shot Kenna because she was holding a hammer and had threatened to kill him.  (Id.).  Hubrecht also told the prosecutor that Kenna "started to 'come for' him" before he fired.  (Id. at 34).  The court refused to admit these hearsay exculpatory statements through the prosecution's witnesses.  (See T. 103-05, 370-71).

[5]     The EMTs had moved the cart into Hubrecht's apartment to clear the area around Kenna.  (T. 395, 403-06).

[6]     Stippling consists of skin abrasions caused by gunpowder when a gun is fired near its target.  (T. 788-89, 814-15).

determined that the gun was not "within a few inches" of Kenna's body when discharged and may, in fact, have been as far as two feet away.  (Id. at 817, 947).  Dr. Turi also concluded that Kenna's arms were at her side when at least two of the six shots were fired; there was no way for her to determine the sequence of the shots or the position of Kenna's arms when the other shots were fired.  (Id. at 804-08, 831, 906, 914-17, 920, 967-68).

           2.   Defense Case

           Hubrecht did not testify at trial.  He did, however, call several attorneys to testify about his troubled relationship with Kenna.  Stanley Seitel, Jeffrey Eisenberg, and Ronald Harari ("Harari") each testified about their representation of Hubrecht in connection with disputes with Kenna.  Their testimony confirmed that Kenna had been accusing Hubrecht of theft and vandalism for years.  Kenna sometimes made her accusations by letter, but more often would simply write them on her rent checks.  (Id. at 1626-27).  These notations alleged, among other things, that Hubrecht had stolen such items as umbrellas, clothing, a gold crucifix and other "sundries," and had engaged in "vandalism, causing physical injury."  (Id. at 1627, 1773-74).  The accusations distressed Hubrecht, who asked two of his attorneys and Kenna's bank to contact her to request that she stop making such notations on her checks.  (Id. at 1770-71, 1782, 1784-87, 1907-08).  Kenna ignored these requests and continued to make disparaging remarks on her rent checks.  (Id. at 1787).

Hubrecht also told one of his attorneys that Kenna had threatened him, and his mother, brother, and nephew, with a hammer decades earlier.[7]  (Id. at 1869, 1886-87). Another attorney, Harari, testified similarly that Kenna had verbally threatened Hubrecht, telling him that she would "make [his] life miserable" and that she was "going to get [him]."  (Id. at 1912-13).  In 2000, Harari prepared a Notice of Termination in an effort to evict Kenna.  (Id. at 1946).  After Kenna's attorney responded, Harari advised Hubrecht to obtain proof that Kenna's accusations were false.  (Id. at 1949-52).  To assist in that effort, Harari drafted the letter that Hubrecht sent to ADT requesting information regarding Kenna's alarm system.  (Id. at 1952-53).

In 1999, Hubrecht retained Kenneth Rubenstein ("Rubenstein") to help with his estate planning.  (Id. at 1692).  That same year, Hubrecht had been diagnosed with colon cancer, for which he underwent chemotherapy until June 2000.[8]  (Id. at 2239, 2241-44, 2272).  Hubrecht told Rubenstein that he was interested in preserving both brownstones and vehemently rejected Rubenstein's suggestion that he sell these "family heirlooms."  (Id. at 1692-93).

---

[7]      Hubrecht's nephew, Richard Tressan ("Tressan"), testified about an incident in which Kenna approached him, with a hammer in her hand, while he was doing maintenance work at 700 Madison Avenue in 1984.  Kenna stated to Tressan that he "should be exterminated like all the others."  (T. 2772-74).

[8]      An oncologist testified for the defense that the side effects associated with chemotherapy, which included gastro-intestinal distress, weakness, and fatigue, often continue after treatment has ended.  (T. 2269-73).

8

As part of the defense case, Hubrecht also called several experts.  Dr. Cyril Wecht ("Dr. Wecht"), a coroner, agreed with most of Dr. Turi's testimony regarding the Kenna autopsy results.  Dr. Wecht concluded, however, that the shots had been fired within four to eighteen inches of Kenna and could not have been fired from as far away as two feet, as Dr. Turi claimed.  (Id. at 947, 971-72, 2094).  Dr. Wecht also opined that Kenna's arm could have been raised when several of the shots were fired.  (Id. at 2097-102).  Kenneth Cooper, an expert in firearm safety, testified that an average person in a stressful situation could fully discharge a .38 caliber revolver in less than two seconds without intending to do so or realizing that he had.  (Id. at 2754-57).

Dr. Dawn Hughes, ("Dr. Hughes"), a clinical and forensic psychologist who evaluated Hubrecht shortly before trial, testified that Hubrecht suffered from a schizoid personality disorder accompanied by paranoid traits.  (Id. at 2337, 2355, 2389, 2393, 2398).  She explained further that Hubrecht had few interpersonal relationships, limited problem solving ability, and little psychological insight.  (Id. at 2389, 2395-97).  Because Dr. Hughes was permitted to testify about any statements made by Hubrecht, his sisters, or others that she had relied on in forming her opinions, the jury heard otherwise inadmissible testimony about Hubrecht's claims of Kenna's past abuse, including an incident during which Kenna allegedly hit Hubrecht across the cheek with a rolled up magazine and pushed his mother onto the floor.  (Id. at 2368-69, 2381-82, 2386-87).  Justice Beeler repeatedly cautioned the jurors that these statements were being admitted

solely to assist them in evaluating Dr. Hughes's opinions and not for their truth.  (Id. at 2368-69, 2513, 2553-54, 2688-89).

Dr. Hughes opined that Hubrecht acted in self-defense on the date of the incident based upon his subjective belief that Kenna was about to injure him seriously. (Id. at 2420-21).  In reaching this conclusion, Dr. Hughes relied on Hubrecht's statements that (a) he saw Kenna with a hammer in her hand when he opened his door on the morning of September 11, 2000 (id. at 2413-14), (b) Kenna threatened to kill him and "made a movement to go forward" (id. at 2414), (c) he perceived Kenna as a genuine threat because of the escalating hostility between them and his own failing health and inability to defend himself (id. at 2416-19), and (d) he believed his only option was to shoot her (id. at 2416-21).

In an effort to bolster Hubrecht's claim of self-defense, his counsel sought to introduce the contents of the bags recovered from Kenna's luggage cart, which included hundreds of documents from the late 1960s to the late 1990s, on which Kenna had made notations regarding Hubrecht's purported break-ins to her apartment, as well as court papers, police reports, and legal correspondence related to her tenancy at 700 Madison Avenue.[9]  (Id. at 1418-33, 1500-01, 1511-15).  Justice Beeler agreed that the papers reflected an "obsession" with Hubrecht but declined to receive them, stating that it

---

[9]     Defense counsel renewed his offer of evidence during the People's rebuttal case before the People called Kenna's niece and a former neighbor to refute the claim that Kenna was obsessed with Hubrecht.  (T. 2822-46).  The court again rejected the proffer.  (Id. at 2844-46).

would not be reasonable for the jury to infer from the documents that Kenna was the initial aggressor or had threatened Hubrecht shortly before the shooting.  (Id. at 1523-26). He also rejected defense counsel's suggestion that an excerpt from Kenna's diary, dated October 16, 1994, constituted a threat.  (Id. at 1526).  That entry stated that "The paths of glory lead but to the grave."  Immediately below these words were Hubrecht's name and the names of three other persons.  (Ex. A).[10]

### 3.   Jury Charge

At a pre-charge conference, Hubrecht's counsel argued that there was a sufficient factual predicate to instruct the jury with respect to the defense of justification given the history of tension between Hubrecht and Kenna, her proximity to him when the shots were fired, and the fact that a hammer was found in her hand.  (Id. at 2921-59). Justice Beeler initially agreed, but later reversed himself after hearing further argument. (Id. at 2962-64, 3001).  The Justice nevertheless instructed the jury with respect to the affirmative defense of extreme emotional disturbance, pursuant to which the charge of Murder in the Second Degree could have been reduced to Manslaughter in the First Degree if a preponderance of the evidence established that Hubrecht was "under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse" at the time of the shooting.  (Id. at 2970, 3278, 3288-3301).

### 4.   Verdict and Sentence

---

[10]   Ex. A is a lengthy unpaginated exhibit.  The quoted excerpt appears approximately twenty-seven pages from the end of the compilation.

Notwithstanding the instructions concerning extreme emotional disturbance, the jury returned a verdict of guilty on the charge of Murder in the Second Degree on March 8, 2002.  (Id. at 3319).  On April 30, 2002, Justice Beeler sentenced Hubrecht to an indeterminate prison term of twenty years to life.  (S. 28).

B.     Subsequent Procedural History

Hubrecht appealed his conviction to the Appellate Division, First Department, contending that:  (1) the exclusion of statements to the "911" operator, the police, and an assistant district attorney in which he had claimed that he shot Kenna in self-defense was error, because they were admissible (a) to rebut a misleading impression created by the People, and (b) under New York's "rule of completeness;" (2) he was entitled to a justification charge; (3) the prosecutor's summation argument that defense counsel had concocted Hubrecht's self-defense claim violated his right to a fair trial; and (4) the contents of Kenna's luggage cart should have been received.  (See Pet'r's Br. at 32, 47, 56, 72, 82).

On December 18, 2003, the Appellate Division, First Department, unanimously affirmed Hubrecht's conviction.  People v. Hubrecht, 2 A.D.3d 289 (1st Dep't 2003).  The court held that the exclusion of Hubrecht's exculpatory statements was proper because there was "no exception to the hearsay rule under which the . . . statements could be admitted."  Id.  As the court explained, the statements were "made to different persons in different settings and could not be viewed as a single continuous narrative or process of interrogation" to which the rule of completeness might apply.  Id.

at 289-90.  The court also concluded that the prosecutor did not open the door to admission of the exculpatory statements through his questioning of Benny because "the isolated instances of which [Hubrecht] complains did not create a misleading impression that [he] never told anyone that he acted in self-defense." Id. at 290.

The Appellate Division further held that Justice Beeler's decision not to charge the jury with respect to justification was proper because there was "no reasonable view of the evidence, even when viewed in a light most favorable to [Hubrecht, that] supported the defense." Id. (citations omitted).  As the court noted, even if there were enough circumstantial evidence for the jury to find that Kenna had threatened Hubrecht with a hammer, "there was still no evidence that [Hubrecht] believed he was in imminent danger of [her] use of deadly force, or that such belief was reasonable." Id. (citations omitted).

The Appellate Division also upheld the trial court's decision to exclude the writings found in Kenna's luggage cart, noting that Hubrecht had never seen them and that they contained only one arguably threatening statement, which was "very remote in time," and were "otherwise irrelevant to the state of mind of either [Hubrecht] or [Kenna]." Id. (citations omitted).  Finally, the court held that Hubrecht's challenge to the People's summation was unpreserved and not meritorious.  Id.

On March 29, 2004, the New York Court of Appeals summarily denied Hubrecht's application for leave to appeal.  People v. Hubrecht, 2 N.Y.3d 741 (2004).  Hubrecht did not thereafter file a petition for writ of certiorari.

13

C.   Habeas Petition

Hubrecht timely filed his habeas petition on June 23, 2005.[11]  (See Docket No. 1).  In his petition, Hubrecht reasserts three of his claims, arguing that (1) he was entitled to a justification charge, (2) the contents of Kenna's luggage cart should have been received, and (3) the trial court should have admitted Hubrecht's exculpatory self-defense statements to rebut the misleading impression that Hubrecht never claimed self-defense.  (Pet. at 5-6; see also Pet'r's Mem. at 36-80).  Hubrecht is represented in this proceeding by the same attorneys who represented him at trial and on appeal.

III.   Discussion

A.   Exhaustion

Hubrecht's petition may not be granted unless he has exhausted all available state court remedies, or there is an absence of state corrective process, or circumstances render that process ineffective to protect the petitioner's rights.  See 28 U.S.C.        § 2254(b)(1)(A), (B).  As a defendant charged with crimes in New York State, Hubrecht unquestionably had an effective process available to him through the existing state statutes governing direct appeals.  See N.Y. Crim. Proc. Law § 450.10 (McKinney 2005).  Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Hubrecht must show that he presented the substance of "the same

---

[11]        See 28 U.S.C. § 2244(d)(1)(A) (petition is subject to one-year statute of limitations running from "the date on which the judgment became final"); Valverde v. Stinson, 224 F.3d 129, 132 (2d Cir. 2000) (conviction becomes final "when the ninety-day period to seek direct review from the United States Supreme Court by way of certiorari expire[s]").

federal constitutional claim[] that he now urges upon the federal courts to the highest court in the . . . state." Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal citations and quotation marks omitted).

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982)).  To meet this requirement, it is not necessary that the federal constitutional claim be presented to the state courts in haec verba.  Indeed, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.

The respondent contends that Hubrecht's claim relating to the trial court's failure to give a justification charge is unexhausted and procedurally barred.  (See Resp't's Mem. at 60-64).  Indeed, Hubrecht's discussion of this claim in his briefing before the Appellate Division – unlike the discussion of his other claims – makes no mention of the United States Constitution or federal case law.  (See Pet'r's Br. at 56-71).

Nevertheless, Hubrecht argued before the Appellate Division that, "[b]y refusing to give the justification charge . . . , the trial court deprived [him] of his right to a <u>fair</u> <u>trial</u>."  (<u>Id.</u> at 71) (emphasis added).  Although the respondent contends that this verbiage was insufficient to put the state court on notice that he was asserting a <u>federal</u> due process claim, (<u>see</u> Resp't's Br. at 62-63 n.64), there is no need to resolve this issue because a federal court may reach the merits of a habeas claim in order to <u>deny</u> it despite a petitioner's failure to exhaust all of the state court remedies available to him.  <u>See</u> 28 U.S.C. § 2254(b)(2).  As set forth below, Hubrecht's jury charge claim is meritless.  Accordingly, I have considered that claim despite the respondent's contention that it is unexhausted.

  B. <u>Merits</u>

    1. <u>Standard of Review</u>

   A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993).  Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated.  <u>See Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).

   Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that all reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  To the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that:  "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

### 2.    Justification Charge

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."  Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  Accordingly, a mere instructional error regarding state law does not generally require a federal court to set aside a state court conviction on habeas review.  Gilmore v. Taylor, 508 U.S. 333, 342, 344 (1993) (citing Estelle v. McGuire, 502 U.S. 62 (1991)).  Rather, to prevail on his failure-to-instruct claim, Hubrecht must show that:  (a) a justification charge was required under New York law; (b) the failure to give that charge rendered his conviction fundamentally unfair; and (c) the state court error is of such a nature that it is remediable by habeas corpus relief under Section 2254.  Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001).

18

Section 35.15 of the New York Penal Law governs Hubrecht's entitlement to a justification charge.  The statute provides that "[a] person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself . . . from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person."  N.Y. Penal Law § 35.15(1) (McKinney 2004) (emphasis added).  A defendant requesting a justification charge therefore must meet a two-part test, encompassing both a subjective and an objective component.  See In re Y.K., 87 N.Y.2d 430, 433-34 (1996); People v. Goetz, 68 N.Y.2d 96, 115 (1986).  Specifically, there must be sufficient evidence that (a) the defendant actually believed deadly physical force was necessary, and (b) this belief was objectively reasonable under the circumstances.  Jackson v. Edwards, 404 F.3d 612, 623 (2d Cir. 2005) (citing Y.K., 87 N.Y.2d at 433-34, and Goetz, 68 N.Y.2d at 114-15).  The statute also prohibits the use of deadly force if a person knows that he can "with complete safety as to himself and others avoid the necessity of doing so by retreating."  N.Y. Penal Law § 35.15(2)(a) (McKinney 2000).  Accordingly, if Hubrecht were standing in his doorway or the hallway, he would have been required to retreat into his apartment if he could.  This rule would not apply if he were standing inside his apartment and was not the initial agressor.  See id. § 35.15(2)(a)(i); People v. Aiken, 4 N.Y.3d 324, 327-30 (2005).

New York law further provides that a trial court must give a justification charge "whenever there is evidence to support it," People v. Petty, 7 N.Y.3d 277, 284 (2006) (citing People v. McManus, 67 N.Y.2d 541, 549 (1986)), and that the failure to do

19

so constitutes reversible error, McManus, 67 N.Y. 2d at 549; People v. Padgett, 60

N.Y.2d 142, 145 (1983).  In deciding whether a defendant is entitled to a justification

charge, any evidence tending to support the defense must be viewed in the light most

favorable to the defendant.  Davis, 270 F.3d at 124-25; McManus, 67 N.Y.2d 549.  A

court is not required to charge justification, however, where no reasonable view of the

evidence supports the defense.  People v. Watts, 57 N.Y.2d 299, 301 (1982); see

McManus, 67 N.Y.2d at 549; Padgett, 60 N.Y.2d at 144-45; see also People v. Butts, 72

N.Y.2d 746, 750 (1988) (court need not adopt an "artificial or irrational" view of the

evidence in deciding whether to charge justification).[12]

       Turning first to the subjective element of the justification defense, a

defendant must present evidence demonstrating that he actually believed that "deadly

force was necessary to avert the imminent use of deadly force."  Goetz, 68 N.Y.2d at 113;

Y.K., 87 N.Y.2d at 434.  In an effort to do so, Hubrecht focuses on his statements to Dr.

Hughes concerning the incident and his relationship with Kenna.  (Pet'r's Mem. at 39-

44).  However, Justice Beeler repeatedly instructed the jury that this evidence was

received only for the limited purpose of explaining the basis of Dr. Hughes's opinions.

(T. 2368-69, 2513, 2553-54, 2689).  Because Hubrecht's statements to Dr. Hughes were

not admitted for their truth they obviously cannot be considered evidence that Hubrecht

---

[12]     Because justification is a defense, but not an affirmative defense, when it is
charged, "the People bear the burden of disproving it beyond a reasonable doubt."  Davis, 270
F.3d at 124.

believed it was necessary to use physical force to defend himself from an imminent use of unlawful physical force by Kenna.

Once Dr. Hughes's testimony is removed from the equation, it is clear that there was virtually no evidence that Hubrecht subjectively believed that he faced the imminent use of unlawful force.  At best, Hubrecht established at trial that Kenna had harassed him and his relatives over an extended time period.  (See, e.g., id. at 1869, 1886-87, 1912-13, 2774).  However, the proof regarding Kenna's actual use of force was limited to several instances in which she allegedly had wielded a hammer, most (if not all) of which had occurred decades earlier.  (See, e.g., id. at 1869, 1885-88 (Friedrich's testimony about Hubrecht's claim that Kenna had threatened his mother and brother with a hammer in the 1980s (or earlier) and also had threatened him with a hammer at an unspecified time); 1914 (Harari's testimony that Hubrecht had reported a threat against a relative involving a hammer which "was sometime in the past" and "kind of remote for us to use in our case because it might have been beyond the statute of limitations"); 2772-74 (Tressan's testimony that, in 1984, while discussing her dislike of Hubrecht and his family members (including Tressan), Kenna had "emphatically flex[ed]" a hammer she was holding using a "flick of [her] wrist")).  The evidence also showed that a hammer was found near Kenna's left (non-dominant) hand.  (Id. at 296-97, 399).  Finally, Dr. Wecht testified that Kenna's arm might have been raised when several of the shots were fired.  (Id. at 2097-102).

21

Assuming, arguendo, that this evidence was sufficient to establish the subjective element of a justification defense, Hubrecht still had to establish some basis upon which the jury could have concluded that it was objectively reasonable for a person in Hubrecht's circumstances to believe that the use of deadly force was necessary in order to be entitled to the requested instruction.  See Y.K., 87 N.Y.2d at 434; Goetz, 68 N.Y.2d at 115.  Here, however, because Hubrecht chose not to testify, there was a complete absence of any evidence regarding his contact with Kenna in the moments preceding the shooting.  In particular, there was no evidence that Hubrecht could not have remained inside, or safely retreated into, his apartment.  Indeed, the evidence suggested that Kenna's luggage cart was between Hubrecht and Kenna while they were in the hallway.  (Id. at 403-06).  If so, he undoubtedly could have safely retreated into his apartment without shooting Kenna six times.

The Second Circuit's decision in Davis regarding the justification defense is consequently inapposite.  In that case, upon which Hubrecht places considerable reliance, the defendant testified to the circumstances leading to his shooting of the alleged assailant, a man nicknamed "Bubblegum," who was a six-foot tall, 435-pound PCP user. Davis, 270 F.3d at 116-17.  Davis testified that Bubblegum previously had robbed him at gunpoint three times, had raped him, and had threatened to kill him the next time they met.  Id. at 116-18.  Despite this history, the Second Circuit held that when Davis first saw Bubblegum on the day of the shooting, he had no duty to retreat because "Bubblegum had merely made eye contact with [him and] had not moved in [his]

22

direction, much less made any threatening gestures."  Id. at 126.  Davis left the area,

however, and returned with a gun.  Id. at 119.  After he did so, Bubblegum eventually

crossed the street and approached Davis.  Id.  Another eyewitness described Bubblegum

at approximately this time as someone whose eyes were "bugging out" and who was

"popping out real sweats."  Id.

       When Davis and Bubblegum were about fifteen to twenty feet apart,

Bubblegum made eye contact; he then walked a few steps beyond Davis, before turning

back and reaching into his waistband.  Id.  During their prior confrontations, Bubblegum

had carried a gun.  Id. at 120.  Davis testified that he therefore believed that he was about

to be harmed and shot Bubblegum several times.  Id.  When he was "[a]sked why he did

not flee, . . . Davis said he was scared to turn his back" because Bubblegum had told him

that he was going to kill him and he "didn't want to get shot in [his] back."  "[He]

characterized himself as 'stuck.'"  Id. at 119.

       On these facts, the Second Circuit held that Davis was entitled to a

justification instruction.  Id. at 130-31.  Similarly, in this case, if there had been any

evidence that Hubrecht reasonably believed that Kenna was about to inflict deadly force

and that he had no opportunity to retreat, Justice Beeler would have been required to give

the jury a justification instruction.  For reasons which are unexplained, however,

Hubrecht chose not to testify in his own defense to describe the circumstances leading to

the shooting.  Moreover, the only other person present in the staircase when the shots

were fired was dead.  Although Hubrecht obviously had a constitutional right not to

testify, the consequence of his exercise of that right was that there was a complete lack of evidence that it was objectively reasonable for Hubrecht to use deadly force.  As Justice Beeler correctly concluded, the jury would therefore have had to resort to speculation to fill this void.  (Id. at 3000-01).  It follows that Hubrecht was not entitled to a justification charge under New York law.  The trial court's jury instructions therefore did not deny him a fair trial.

        3.    Evidence

Hubrecht next contends that the trial court deprived him of a fair trial by excluding the contents of Kenna's luggage cart, which included court papers, letters, and writings reflecting her complaints about Hubrecht over the course of thirty years.  (Pet'r's Mem. at 57-66).  Hubrecht first attempted to introduce this evidence during the People's case-in-chief to demonstrate Kenna's "obsession" with and hostility against Hubrecht. (T. 1418-24).  Hubrecht's counsel made this proffer after the prosecutor sought to introduce other items from the luggage cart to show that there was nothing unusual about Kenna's activities in the days preceding her death.  (Id. at 1412-18).  Hubrecht's counsel contended that the additional evidence was relevant to Hubrecht's justification defense because it established that Kenna was angry with Hubrecht on September 11, 2000.  (Id. at 1432-33, 1436-39).  Counsel again sought the admission into evidence of items from the luggage cart before the prosecution called two rebuttal witnesses in an effort to show that Kenna was focused on matters other than her dispute with Hubrecht shortly before

24

the shooting and, therefore, was not obsessed with him.  (Id. at 2822-23, 2831-32, 2839, 2841).

During the People's case-in-chief, Justice Beeler rejected both the prosecution's proffer and Hubrecht's proffer after reviewing the contents of the luggage cart overnight.  (See id. at 1441, 1523-26).  The Justice observed that Kenna's papers reflected her "preoccupation" with Hubrecht, but concluded that they were not the same as a series of direct threats and did not warrant an inference that she was the aggressor. (Id. at 1524-25).  He noted, however, any documents that Hubrecht had seen prior to the shooting, such as Kenna's heavily-annotated rent checks, would be received because they were relevant to Hubrecht's state of mind.  (Id. at 1527).

Subsequently, both before the People presented their rebuttal witnesses and after they rested their case, Justice Beeler rejected Hubrecht's renewed proffers of items from the luggage cart.  (Id. at 2842, 2904-06).  In doing so, the Justice stated that the documents "would be [an] excessive response to what [he] thought was a limited amount of testimony . . . that [he] permitted the People."  (Id. at 2906).

On appeal, Hubrecht argued that the trial court committed an error of "constitutional dimension" by refusing to admit certain documents from the luggage cart that he believed constituted a direct threat by Kenna against Hubrecht.  (Pet'r's Br. at 84). The Appellate Division concluded, however, that the luggage cart documents included "only a single ambiguous statement, very remote in time, that was arguably a threat, and

they were otherwise irrelevant to the state of mind of either [Hubrecht] or [Kenna]." Hubrecht, 2 A.D.3d at 290.

It generally is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle, 502 U.S. at 67-68, because "rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of constitutional violation," Copes v. Schriver, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997); accord Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983).  To prevail on his due process claim, Hubrecht consequently must show that the evidentiary errors were "of constitutional dimension" and deprived him of "fundamental fairness."  Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000) (petitioner bears a "heavy burden" in showing that state evidentiary errors deprived him of his constitutional right to a fair trial); McCray v. Artuz, No. 93 Civ. 5757 (LBS), 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994) (habeas relief only warranted where petitioner demonstrates that the state evidentiary error was of "constitutional magnitude").  For an evidentiary error to rise to this level, it must have had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 623, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Stated somewhat differently, the evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'"  Dunnigan

v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181

(2d Cir. 1992)).

      As noted, Hubrecht's principal rationale for the admission of the documents

found in the luggage cart was that they established Kenna's "obsession" with him.

However, the jury heard extensive testimony about Kenna's difficult relationship with

Hubrecht, including her installation of a sophisticated alarm system in her apartment, her

prior altercations with members of Hubrecht's family, her musings on her rent checks,

and her other written communications with Hubrecht.  The contents of her cart therefore

were, at best, cumulative evidence to the extent that they were proffered to establish that

Kenna was obsessed with Hubrecht.  The exclusion of such cumulative evidence was well

within the trial judge's discretion.  See Blissett v. Lefevre, 924 F.2d 434, 439 (2d Cir.

1991).

      Moreover, with only one possible exception, the records that Hubrecht

proffered did not make it any more likely that Kenna had suddenly snapped and attacked

Hubrecht on the day she was shot.  Indeed, the undisputed evidence showed that Kenna

had transported these same records up and down numerous flights of steps on a daily

basis for years without ever attempting to use deadly force against Hubrecht.  (See T.

119-20, 216-17).  Hubrecht therefore cannot show that the failure to admit those records

removed a reasonable doubt which otherwise would have existed.

      The one possible exception was the diary entry that paired Hubrecht's name

with a reference to "the grave."  (Ex. A).  As Justice Beeler correctly recognized, "a direct

27

threat by a deceased [against] a defendant [would] be admissible to show that the threats were carried out."  (T. 1525).  He rejected Hubrecht's proffer of the diary entry, however, because it was remote in time (having been written more than five years before the incident) and "extremely ambiguous."  (Id. at 1526).  The Appellate Division similarly concluded that the entry was "ambiguous" and "remote in time."  Hubrecht, 2 A.D.3d at 290.  Although Hubrecht argues that this determination was "clearly erroneous" because "there is no way to determine whether [the diary entry was] made at some time 'remote' to the incident or only minutes before the shooting occurred," (Pet'r's Mem. at 66), the state court's findings are entitled to a presumption of correctness, which Hubrecht's speculation plainly is insufficient to overcome.  See 28 U.S.C. § 2254(e)(1) (petitioner must rebut presumption that state court's factual finding is correct by "clear and convincing evidence").

Furthermore, even if this Court were to accept Hubrecht's conjecture that a diary entry dated October 16, 1994, might actually have been written just before Kenna left her apartment for the last time, the state courts were correct that its contents were ambiguous.  In fact, the purported "threat" – containing the observation that "The paths of glory lead but to the grave" – appears to be a quote from the ninth stanza of Thomas Gray's poem An Elegy Written in a Country Churchyard, which reflects the sentiment that everyone (regardless of their power or wealth) eventually dies.[13]  Consistent with this

---

[13]     The ninth stanza reads:

(continued...)

thought, Kenna's diary entry actually identified <u>four</u> individuals whom she believed were guilty of abusing their power or wealth.  There is no suggestion, however, that Kenna harbored a present intention to kill four people in early September 2000.  Hubrecht's suggestion that Kenna's inclusion of his name on the list manifested her present intention to inflict harm on him is further belied by the very next portion of the diary entry, which explains that "Bob is not on this list" because "[h]e never tells people what to do[.]  Never expresses his opinion except when pressed to do so – [and] then only reluctantly – He gives support and power to [indecipherable]."  (Ex. A).  In light of this addendum, to conclude that the diary entry was admissible, the trial court would have had to assume that Kenna made an entry immediately before she died expressing her intention to kill four people because, unlike Bob, they were outspoken and not supportive.  It is not surprising that Justice Beeler declined to make this leap of faith with respect to a diary entry that also plainly appears to have been written more than five years before the shooting.

    In sum, most of the contents of Kenna's luggage cart constituted cumulative evidence that the trial court was not required to receive.  Moreover, the only conceivable exception to this characterization of the proffered evidence plainly did not constitute a

---

[13](...continued)

    The boast of heraldry, the pomp of pow'r,
     And all that beauty, all that wealth e'er gave,
    Awaits alike th' inevitable hour.
     The paths of glory lead but to the grave.

Thomas Gray, <u>An Elegy Written in a County Churchyard</u> 19 (Artist's ed. 1883).

clear threat to harm Hubrecht on September 11, 2000.  The exclusion of the diary entry and other contents of the luggage cart consequently was well within the trial judge's discretion and did not infringe Hubrecht's constitutional right to a fair trial.

4.    Exculpatory Statements

Hubrecht's final claim is that the prosecutor created a false impression that Hubrecht never told anyone he acted in self-defense, which he should have been permitted to rebut by introducing the statements that he made to the "911" operator and at the police station.  (Pet'r's Mem. at 67-80).

This issue first arose shortly after counsel's opening statements, when Hubrecht's counsel objected that the prosecutor was attempting to "pick and choose" which of Hubrecht's statements would come before the jury.  (T. 104).  Justice Beeler responded that he agreed with the prosecution that Hubrecht's self-serving statements were "not admissible for the defendant under these circumstances."  (Id.).  Subsequently, after Benny testified about his arrival at the Madison Avenue scene, and Hubrecht's admission that he had shot Kenna, the prosecutor asked whether Hubrecht said anything else before Benny went upstairs.  (Id. at 384-85).  At that point, defense counsel objected once again and sought to establish that Hubrecht told the "911" operator that he had shot Kenna because she threatened him with a hammer.  (Id. at 385-87; see also id. at 365-71 (defense counsel's first unsuccessful application)).  Justice Beeler denied this renewed application.  (Id. at 387).  When the prosecution then asked Benny if he had recited "the complete conversation . . . between you and [Hubrecht]," Benny said, "Yes."  (Id. at 387).

30

Subsequently, Sergeant Henry and Officer Wong, two of the first policemen to arrive at the scene, testified.  The prosecutor asked each of them whether Hubrecht had stated that he had shot Kenna in self-defense.  (Id. at 749, 886).  In both instances, the trial court sustained a defense objection, but denied defense counsel's request to admit the prior exculpatory statements that Hubrecht had made at the precinct, in which he indicated that he acted in self-defense.  (Id. at 749, 755, 886-90).  Defense counsel also was not permitted to ask Sergeant Henry questions about the "911" call.  (Id. at 755-60).

At trial, defense counsel contended that he was entitled to introduce Hubrecht's exculpatory statements because the prosecutor was misleading the jury into believing that Hubrecht had failed to assert on the day of the shooting that he had acted in self-defense.  (See id. at 385-86, 886-87).  In this forum, he now argues that the trial court's rulings violated clearly-established federal case law which holds that "a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution."  (Pet'r's Mem. at 73 (quoting Su v. Filion, 335 F.3d 119, 126 (2d Cir. 2003))).

There is, of course, a fundamental difference between the statements by Hubrecht that the prosecution offered and those offered by the defense.  Under both state and federal law, Hubrecht's inculpatory statements constituted admissions that could properly be received under longstanding evidentiary rules.  See Fed. R. Evid. 801(d)(2) (statement by one party offered by adverse party is not hearsay); People v. Chico,

31

90 N.Y.2d 585, 589 (1997) ("[A]dmissions by a party of any fact material to the issue are always competent evidence against him, wherever, whenever, or to whomsoever made.") (citations omitted).  On the other hand, self-serving statements by a criminal defendant are routinely excluded as inadmissible hearsay.  See United States v. Peterson, 100 F.3d 7, 13 (2d Cir. 1996) (defendant who declines to testify is not "unavailable" within the meaning of Fed. R. Evid. 804(b)(3)); People v. Hentley, 155 A.D.2d 392, 394 (1st Dep't 1989) (proper to exclude exculpatory statement made one hour after inculpatory statement where "defense counsel failed to demonstrate that the written statement fell within a recognized exception to the hearsay rule").  Here, Hubrecht cannot seriously dispute that his exculpatory statements to Benny and to the police at the precinct constitute classic hearsay.  Accordingly, those statements were inadmissible unless Hubrecht is able to show some other basis for their admission.

Both the federal and state courts recognize a limited exception to the inadmissibility of exculpatory hearsay statements where fairness dictates that they be received together with the inculpatory aspects of the same statements so that the jury will not misinterpret what was said in the absence of context.  In the federal system, this rule of completeness is found in Rule 106 of the Federal Rules of Evidence, which provides that when a written or recorded statement or portion thereof is introduced, an adverse party may require the introduction of "any other writing or recorded statement which ought in fairness to be considered contemporaneously."  The New York courts similarly recognize that "when an out-of-context admission" of a portion of a statement against

32

penal interest "will be unfairly prejudicial to the party against whom it is offered, so much of the remainder as places it in an accurate perspective should, in the sound discretion of the court, not be excluded."  People v. Maerling, 46 N.Y.2d 289, 298-99 (1978) (emphasis added); see also William P. Richardson & Jerome Prince, Richardson on Evidence § 8-210 (Richard T. Farrell ed., 11th ed. 1995) (party against whom a statement is offered "has the right to prove any other statement made by him at the same time which tends to modify . . . the effect of the admission").

Here, Hubrecht's argument under the completeness rule fails for two reasons.  First, even though the Federal Rules of Evidence incorporate a completeness rule, it is not a federal constitutional requirement.  Perez v. Phillips, No. 04 civ. 3859 (NRB), 2005 WL 517336, at *5 (S.D.N.Y. Mar. 4, 2005).  Second, even when the completeness rule is applicable, it does not warrant the wholesale admission of hearsay statements lacking indicia of reliability.  See, e.g., Maerling, 46 N.Y.2d at 299 ("We do not adopt the view that it is enough for the self-serving matter merely to be closely connected with the disserving portion."); see also People v. Moe, 227 A.D.2d 253, 254 (1st Dep't 1996) (the prosecution need not apprise a grand jury of a post-arrest statement by the defendant which was "not a continuation or amplification of earlier inculpatory statements").

As noted previously, Hubrecht made exculpatory statements both before and after he spoke to Benny and the police at his apartment building.  He argues that these exculpatory statements should have been brought to the jurors' attention so that they

would not be left with the mistaken impression that he had admitted killing Kenna but had offered no explanation for doing so.  However, the prosecutor merely asked Benny whether Hubrecht said anything else as a means to transition from the conversation that took place in front of 700 Madison Avenue to what Benny did next.  Although Hubrecht suggests that the question was posed to draw the jury's attention to the fact that he did not claim self-defense while speaking with Benny, the prosecutor never suggested – in summation or otherwise – that a defendant with a legitimate justification defense would have said something to that effect when the EMTs first arrived at the scene.  There consequently was no misleading void that needed to be filled during Benny's testimony through the use of Hubrecht's statements to others.

The prosecutor's examination of the police officers admittedly was less benign.  As noted, the prosecutor asked both Sergeant Henry and Officer Wong whether Hubrecht said anything about Kenna attacking him with a hammer.  Had the officers been permitted to answer these questions, there might have been a colorable factual basis for Hubrecht's claim that the jury was misled and that the prosecutor overreached.  See Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967) ("[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact.").  In both instances, however, Justice Beeler sustained defense counsel's objections.  (T. 749, 890.)  Moreover, after the second attempt to adduce this evidence, the Justice admonished the jury:

> when I sustain an objection to a question . . . the question is
> not proper in my view under the rules of evidence.  Any
> answer that is given has to be disregarded.  The question itself
> is never evidence.  In fact nothing that the attorneys say
> themselves is evidence.  It is only the question and the answer
> that is given to the question that constitute evidence.

(Id. at 891-92; see also id. at 22-23 (similar instruction)).  The jury must be presumed to have followed these curative instructions unless Hubrecht can show an "overwhelming probability" that it did not and a "strong likelihood" that the improper questioning was "devastating to the defendant."  Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); Herring v. Meachum, 11 F.3d 377, 378 (2d Cir. 1993) (quoting Greer, 483 U.S. at 766 n.8).  Here, in the absence of any improper argument on the part of the prosecutor, Hubrecht unquestionably has not met this heavy burden.[14]

Finally, even if Hubrecht were able to show that the prosecutor's questioning created a misleading impression, the introduction of his exculpatory statements to others would not have been an appropriate remedy.  In its most expansive recitation of the rule of completeness, the New York Court of Appeals indicated that a defendant is "entitled to have the entirety of [his] admissions, both the inculpatory and the exculpatory portions, placed in evidence before the trier of facts."  People v. Dlugash, 41 N.Y.2d 725, 736 (1977).  As the Appellate Division accurately observed in this case,

---

[14]    Hubrecht also complains that after sustaining the objection with respect to Officer Wong, Justice Beeler himself asked whether Hubrecht had said anything to the officer at the door to 700 Madison Avenue.  (T. 750).  Following Wong's testimony that Hubrecht "did not," the Justice instructed the prosecutor, "Let's move on, counsel."  (Id.).  There was nothing false or misleading about this portion of the officer's testimony.  Accordingly, there was no reason to admit Hubrecht's self-serving hearsay statements as a corrective measure.

however, the exculpatory language that Hubrecht sought to introduce was not part of any statement that Hubrecht made to Benny or the police at the scene of the shooting.  Rather, Hubrecht sought to introduce statements that he made to other persons at other times. Hubrecht has not cited any authority from New York or elsewhere which would require the rule of completeness to be given an interpretation so expansive as to require the admission of such clear hearsay.  See Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer [evidence] that is . . . inadmissible under standard rules of evidence.")); United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (constitutional right to present a defense "does not give criminal defendants carte blanche to circumvent the rules of evidence").

In sum, contrary to Hubrecht's assertions, there is no reason to believe that the jury was misled by the prosecutor's questioning of his witnesses.  Moreover, even if Hubrecht were able to show that the prosecutor conveyed a false impression, the failure of the trial court to admit his self-serving statements did not violate his Fourteenth Amendment right to a fair trial.

IV.   Conclusion

For the foregoing reasons, Hubrecht's petition should be denied. Furthermore, because Hubrecht has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

V.     Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties are hereby directed that if they have objections to this Report

and Recommendation, they must, within ten days from today, make them in writing, file

them with the Clerk of the Court, and send copies to the chambers of the Honorable

Richard J. Holwell and to the chambers of the undersigned, at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Holwell.  The failure to

file timely objections will result in a waiver of those objections for purposes of appeal.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S.

140, 147-48 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).


Dated:        New York, New York
              January 24, 2008

                                                        FRANK MAAS
                                                United States Magistrate Judge

Copies to:

Robert C. Gottlieb, Esq./Stephanie M. Carvlin, Esq.
Law Office of Stephanie Carvlin
111 Broadway, Suite 701
New York, New York  10006

Hilary A. Hassler, Esq.
New York County District Attorney's Office
One Hogan Place
New York, New York 10013