UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/11/10

LOUIS HUBRECHT,

                              Petitioner,

                -against-

DALE ARTUZ,

                              Respondent.

05 Civ. 5861 (RJH) (FM)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, U.S. District Judge:

Louis Hubrecht was convicted of murder in the second degree following a jury trial in
New York Supreme Court, and was sentenced to a term of 20 years to life. Having exhausted his
direct appeals, Hubrecht petitioned this Court for a writ of habeas corpus. The Court referred the
petition to Magistrate Judge Frank Maas, who issued a Report and Recommendation (the
"Report") denying Hubrecht's claims. Hubrecht timely objected to portions of the Report,
arguing that the jury should have been permitted to entertain his theory of self-defense, and that
the trial court's refusal to instruct the jury on this theory violated his Sixth and Fourteenth
Amendment rights to a fair trial. Hubrecht also argued that his rights were violated when the
trial court refused to admit certain pieces of evidence favorable to him. As to the claim that the
jury should have been instructed on self-defense, Hubrecht cannot point to evidence from which
a jury could reasonably infer that Hubrecht objectively believed deadly force was necessary to
defend himself. As to the claims that the trial court improperly refused to admit certain pieces of
evidence, the Court concludes that the court acted well within its discretion. Accordingly, for
these and the reasons stated below, the Court denies Hubrecht's petition and his request for a
certificate of appealability.

## BACKGROUND

At 9:23 a.m. on September 11, 2000, Michael Benny, an emergency medical technician ("EMT"), received a call that a person had been shot at 700 Madison Avenue in New York City. (Trial Tr. at 372–77, 460–61.)  When Benny and his partner arrived on the scene two minutes later, Hubrecht greeted them at the door to the building.  (*Id.* at 377–80, 464.)  Outside the building, Hubrecht admitted to Benny that he had shot a woman named Barbara Kenna and indicated that her body was upstairs.  (*Id.* at 380–81.)  Benny then walked inside the building. As he ascended the stairs, Hubrecht added that he had "mental problems" for which he "takes medication," and that Kenna "keeps harassing us so I shot her."  (*Id.* at 390, 497, 502–03.)

Benny found Kenna's body slumped on the third floor landing directly outside Hubrecht's apartment.  (*Id.* 391–92.)  A luggage cart was also on the landing between the body and Hubrecht's door, which was slightly ajar.  (*Id.* at 403–04.)  Benny noted multiple bullet wounds in Kenna's chest and a claw hammer in her left hand.  (*Id.* at 391–92, 399, 410.)  While he was bent over Kenna, he noticed Valerie Tresnowske, Hubrecht's older sister, pacing in Hubrecht's apartment.  (*Id.* at 407–09, 545.)  Phone records indicate that Tresnowske had received a phone call at 8:15 a.m. that morning from the apartment of Alice Walker, Hubrecht's other sister and a resident of 700 Madison Avenue.  (*Id.* at 697–98.)  Benny ordered Tresnowske downstairs, to which she replied that Hubrecht had "psychiatric problems."  (*Id.* 408–09, 551–53.)  After Benny asked her where the gun was, she said that it was "in the back."  (*Id.*) Eventually, Tresnowske went downstairs to join Hubrecht.  (*Id.* at 546.)

 The police arrived shortly after the EMTs.  Either Benny or his partner identified Hubrecht and his sister to the police, and both Hubrecht and his sister were placed under arrest. (*Id.* at 713.)  (Tresnowske was released later that day.)  After securing the area and obtaining a

search warrant, one of the detectives entered and searched Hubrecht's apartment.  He found a .38 caliber revolver, in plain view, with its safety off.  (*Id*. at 1460–62, 1466–68, 1584.)  The gun was registered to Hubrecht, and he held a permit for its use inside the building.  (*Id*. at 1351–52, 1371.)  When it was recovered, it contained six spent casings.  (*Id*. at 988, 1007, 1010, 1014–15.)  Apart from Kenna's luggage cart, most of the remaining physical evidence was recovered from Kenna herself.  At autopsy, the medical examiner recovered five bullets from Kenna's body and determined that a sixth had passed through.  (*Id*. at 785–88, 798, 800–01, 824–26, 895, 906.)  The hammer recovered from Kenna's left hand was unremarkable except for the fact that forensic experts could find no fingerprints on the metal head or rubber grip.  (*Id*. at 597–604, 611, 618–22, 659.)

At trial, several experts for both the prosecution and the defense testified about what inferences could be drawn from the physical evidence.  Forensic experts on both sides agreed that five bullets had entered Kenna's chest from a downward angle and that a sixth bullet had perforated her arm.  (*Id*. at 2081.)  All the shots had been fired from the gun found in Hubrecht's apartment.  (*Id*. at 1105–08.)  The evidence was largely inconclusive about the position of Kenna's arms when the shots were fired, except for some evidence that Kenna's right arm was at her side for at least two shots.  (*Id*. at 2099.)  The experts disagreed on the precise distance between Kenna and the gun when the shots were fired.  Experts for the prosecution testified that the gun was not against Kenna's body when it was fired (*id*. at 817), and that it was likely more than 28 inches away because of the absence of gunshot residue on Kenna's clothes (*id*. at 1035).  Experts for the defense testified that because there was stippling—abrasions of the skin caused by unburnt particles from the gun—on Kenna's body, four of the shots must have been fired at a distance of less than 24 inches, and one of the four at a distance of less than 12 inches.  (*Id*. at

2094.)

Experts for both the prosecution and the defense were also asked whether various scenarios were consistent with the evidence, including whether Kenna could have been moving forward when the shots were fired, whether Kenna could have had her hands raised during the encounter, and whether anything could be concluded about the order in which the shots were fired. The experts largely agreed that the evidence was simply inconclusive on these questions. The evidence was as consistent with Kenna having one of her hands raised when the shots were fired as it was with Kenna having both her hands at her sides. (*Id*. at 2097, 2099–2101.) Similarly, it was impossible to determine the order in which the shots were fired or which shot actually killed her. (*Id*. at 2082.)

Other testimony at trial confirmed longstanding animosity between shooter and victim. Hubrecht owned 700 Madison Avenue and the building next door. Kenna had been his tenant for more than 30 years. (*Id*. at 98, 100.) For those 30 years, Hubrecht and Kenna lived in the same apartment building and never got along. From very early on, Kenna accused Hubrecht of various improprieties, chief among them his repeated intrusions into her apartment. Kenna believed that Hubrecht would break into her apartment, rearrange her possessions, and sometimes even steal particular items. (*Id.* at 189–90, 1625–27, 1773–74.) For a time, Kenna resorted to writing her accusations down on her rent checks. (*Id.* at 1773–74.) She was also verbally abusive to Hubrecht on several occasions, telling him she would "make [his] life miserable" and that she was "going to get [him]." (*Id*. at 1913.) In 1990, Kenna had a sophisticated alarm system installed to detect the alleged intrusions. (*Id*. at 313–14, 328–31, 334–35.) The system's alarm was never triggered, but Kenna remained convinced that Hubrecht was continuing to break in. (*Id*. at 313, 337–39, 341, 348–49, 351.) Kenna resorted to carrying

4

many of her personal belongings with her in a luggage cart whenever she left her apartment. (*Id.* at 119–20, 216–17.)

For his part, Hubrecht had long been unsettled by Kenna's claims. As a general matter, Hubrecht did not like communicating with his tenants, let alone Kenna, and posted a notice requiring them to communicate to him in writing and not by phone or in person. In the 1990s he began to find even these communications trying, but he did not want to sell the building because he considered them family heirlooms. (*Id.* at 1692–93.) Renting the building out to commercial tenants, however, was complicated by Kenna's continued presence. Because Kenna was protected by New York's rent control laws, evicting her was no easy task. Tresnowske offered to pay Kenna to vacate her apartment in the spring of 2000, but she refused. (*Id.* at 133–34.) Hubrecht next served Kenna with a "Notice Terminating Tenancy," citing her false accusations and the alleged damage that the building suffered when she dragged her luggage cart up and down the stairs. (*Id.* at 1220–22.) Kenna responded by hiring a lawyer to fight the notice. (*Id.* at 1227–32.) Hubrecht's attorneys advised him to document Kenna's behavior if he wanted to have a chance at evicting her. Acting pursuant to this advice, Hubrecht sent a request for records to the company that maintained Kenna's alarm system. (*Id.* at 325.) The company responded by letter that it could not disclose any information without Kenna's consent. It sent a copy of the letter to Kenna shortly before the shooting. (*Id.*)

Although the trial court permitted several witnesses to testify to Hubrecht and Kenna's strained relationship, it refused to admit certain documents found in Kenna's luggage cart that suggested Kenna was obsessed with Hubrecht. Among the items the defense sought to introduce were various diary and calendar entries describing Kenna's belief that Hubrecht was breaking into her apartment, marketing materials for products relating to "counter surveillance," and legal

correspondence relating to Kenna's tenancy at 700 Madison Avenue.  One document, which the defense highlighted, contained the statement "the paths of glory lead but to the grave" above Hubrecht's name.  The defense argued that the documents were evidence of Kenna's state of mind and therefore of whether she was the initial aggressor on the morning of the shooting.  The trial court rejected this argument, holding that, barring the existence of any specific threats, it would be improper for the jury to infer Kenna's conduct on a specific occasion from her occasionally expressed thoughts over time.  (*Id.* at 1512–13.)  Thus it found the documents from Kenna's luggage cart irrelevant.

The defense also sought to introduce evidence of Hubrecht's state of mind at the time of the incident.  Although Hubrecht himself never testified, the trial court did allow Dr. Dawn Hughes, a clinical and forensic psychologist, to render an opinion concerning Hubrecht's psychological state generally as well as an opinion about what Hubrecht was thinking on the morning of the shooting.  In particular, Hughes testified that Hubrecht suffered from schizoid personality disorder, a condition marked by detachment from interpersonal relationships and a restricted range of affect.  (*Id.* at 2389.)  Even more importantly, Hughes testified that, based on what Hubrecht had told her of the incident, "it might follow[] [that] he did have a perception that he was going to be seriously harmed by Ms. Kenna when this happened."  (*Id.* at 2420–21.)

Hughes's testimony was, however, the only evidence of Hubrecht's mental state at the time of the incident.  The defense attempted to introduce through other witnesses numerous statements made by Hubrecht, but the trial court either excluded them or specifically instructed the jury that they could not be considered for their truth.  These statements included Hubrecht's 911 call, during which he told the operator that he had shot a woman "because she had a hammer and threatened to kill [him]," and narratives of the incident that Hubrecht related to the police.

In the narratives, Hubrecht claimed that Kenna had loudly thumped on his door around 8:30 a.m. that morning and greeted him with a raised hammer in her hand, shouting "I'm going to kill you." The trial court excluded as hearsay the transcript of the 911 call, Hubrecht's written statements to the police, and any testimony about the statements except for the testimony from Dr. Hughes. (*Id.* at 104, 387, 749, 755, 886–90.) The court did permit Hughes to testify as to what Hubrecht told her of the incident, but instructed the jury that these statements could be considered only as background for Hughes's opinion and not for the truth of the matter asserted. (*Id.* at 2368–69, 2513, 2553–54, 2689.)

At the charge conference, the trial court initially agreed to instruct the jury on self-defense. (*Id.* at 2962.) After hearing re-argument the following morning, however, the court reversed its position and held that the jury could not conclude that Hubrecht acted in self-defense without engaging in baseless speculation about what actually occurred on the morning in question. (*Id.* at 3001.) Accordingly, the trial court instructed the jury only on murder in the second degree and the defense of extreme emotional disturbance.

The jury convicted Hubrecht of second-degree murder. (*Id.* at 3319.) The trial court sentenced Hubrecht to a term of 20 years to life, and both the verdict and sentence were upheld by the Appellate Division, First Department. *People v. Hubrecht*, 769 N.Y.S.2d 36 (N.Y. App. Div. 2003). The Court of Appeals denied certiorari. *People v. Hubrecht*, 2 N.Y.3d 741, 810 N.E.2d 920, 778 N.Y.S.2d 467 (N.Y. Mar. 29, 2004) (Table). This petition followed.

## DISCUSSION

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where a party makes timely objections, however, the Court must "make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is made."  *Id.*; *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  Because Hubrecht makes objections to almost every aspect of the Report, the Court makes a *de novo* assessment of his petition.

## I.      Exhaustion and the Standard of Review

Habeas relief is usually barred unless "the applicant has exhausted the remedies available in the Courts of the State."  28 U.S.C. § 2254(b)(1)(A).  To satisfy the exhaustion requirement, the petitioner must "apprise the highest state court of both the factual and the legal premises of the federal claims ultimately asserted."  *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005).  Put differently, the "substance" of the federal claim "must have been 'fairly presented' to the appropriate state appellate court."  *Jackson v. Edwards*, 404 F.3d 612, 618 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 278 (1971)).  This requirement exists for reasons of comity.  *Galdamez*, 394 F.3d at 72.  Respect for the state courts "dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief."  *Id.* (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999)).  Accordingly, except in certain narrow circumstances, district courts must deny habeas relief where the state courts have not had the opportunity to adjudicate the petitioner's claims on the merits.  Exhaustion is not a jurisdictional requirement; even if a habeas petition raises unexhausted claims, a district court may reach the petition's merits to deny it.  28 U.S.C. § 2254(b)(2).

The standard of review for habeas claims depends on whether the state courts have adjudicated petitioner's claims on the merits.  A decision "on the merits," in this context, means "a decision finally resolving the parties' claims, with res judicata effect, that is based on the

substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).  On habeas review of such a decision, a district court may grant petitioner relief only if the state courts' decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The standard is frequently referred to as "AEDPA deference," after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), from which it derives.

The government argues that Hubrecht's petition is unexhausted with respect to the failure to give a self-defense charge, otherwise known as a justification charge.[1]  The government notes that in Hubrecht's briefs to the Appellate Division and New York Court of Appeals, he: (1) did not cite the Constitution or use the words "due process"; (2) did not cite any federal cases; and (3) did not cite any state cases applying federal law.  In response, Hubrecht contends that the New York courts were on notice that he was raising a federal claim when he argued in his briefs that "[b]y refusing to give the justification charge in these circumstances, the trial court deprived Mr. Hubrecht of his right to a fair trial."  (Pet.'s Reply at 3.)

In a line of cases beginning with *Daye v. Attorney General of New York*, 696 F.2d 186 (2d Cir. 1982), the Second Circuit has said that a petitioner who does not cite "chapter and verse of the Constitution" may still "fairly present to the state courts the constitutional nature of his claim" through:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on

---

[1] Neither party disputes that Hubrecht's other claims were exhausted in, and decided by, the New York courts.

> state cases employing constitutional analysis in like fact situations, (c) assertion of the
> claim in terms so particular as to call to mind a specific right protected by the
> Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of
> constitutional litigation.

*Id.* at 194.  In *Daye*, the court recognized that the more specifically a right is described, "the

more easily alerted a court will be to consider a constitutional constraint."  *Id.* at 193.  By

contrast, a claim described in "very broad terms," like the "denial of a fair trial," may not be

fairly presented to a state court for purposes of exhausting a federal due process claim.  *Id.*  "Fair

trial," after all, is a concept that embraces "many concrete notions," some fundamental and some

not; not every event accurately described as "unfair" would violate the defendant's constitutional

rights.  *Id.*  It is therefore necessary to examine the factual allegations underlying a broad claim.

If they are of "patently constitutional dimension," *id.*, the federal claim will have been fairly

presented.

In *Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005), the Second Circuit confronted

precisely the question facing the Court here: whether the petitioner had properly exhausted his

federal claim by asking the New York state appellate court "to find that the justification

instruction should have been given."  *Id.* at 621.  Applying the *Daye* framework, the court in

*Jackson* found the claim exhausted.  It emphasized the circumstances in which the claim had

arisen: the defendant's justification defense was "highly credible" and could have "allowed the

jury to acquit" the defendant of second-degree murder.  *Id.*  The trial court's failure to give the

defense was therefore "catastrophic" for the defendant's chances of acquittal.  *Id.*  Given these

facts, any claim that the trial court had improperly failed to charge justification was "necessarily"

a claim that the defendant's due process right had been infringed.  *Id.*

Here, as in *Jackson*, the petitioner did not expressly raise a due process claim to the New

York appellate courts.  But, as in *Jackson*, Hubrecht implicitly raised that claim when he briefed

the issue of the trial court's failure to charge the jury on justification.  First, Hubrecht's brief to the New York Appellate Division argued that the trial court's refusal to give a justification charge "deprived Mr. Hubrecht of his right to a fair trial."  (*Id.* at 71.)  The claim was fairly unspecific, but there is no indication that the defendant in *Jackson* went even this far in his briefs to the New York appellate courts.

Second, the circumstances of Hubrecht's case demonstrate that the failure to give a justification defense proved costly to him, as it did for the defendant in *Jackson*.  The evidence that Hubrecht had killed the victim was overwhelming.  Testimony at trial revealed that Hubrecht had admitted to killing the victim; all six gunshot wounds were traced to a gun found in Hubrecht's apartment.  A justification instruction would have allowed the jury to find that Hubrecht had acted in self-defense to protect himself from an angry tenant holding a hammer at his door.  Even though the justification defense in Hubrecht's case was less credible than in Jackson's, it was nevertheless critical to Hubrecht's hopes of acquittal.  As Hubrecht's counsel said in her main brief to the New York Appellate Division, "Louis Hubrecht's defense was justification."  (Appx. to Resp.'s Answer, Ex. A, at 56.)  The trial court's decision not to instruct the jury on that defense dramatically affected Hubrecht's case.  Hubrecht's claim that the decision was wrong was a claim that inexorably implicated a constitutional right—just as a similar claim did in *Jackson*.

The Court concludes that Hubrecht has properly exhausted this claim.  And, by resolving the claim on a substantive rather than procedural ground, the New York courts adjudicated the claim on the merits for the purposes of 28 U.S.C. § 2254(d).  Accordingly, the Court will apply AEDPA deference to the Appellate Division's denial of his claim regarding the absence of a justification charge, as it will to the Appellate Division's denial of Hubrecht's evidentiary

claims.

## II.     The Refusal to Give a Justification Charge

In his first objection to the Report, Hubrecht argues that he is entitled to habeas relief because the state court's refusal to instruct the jury on self-defense violated his federal right to a fair trial.  To obtain relief, Hubrecht must demonstrate that: (1) New York law did in fact require the trial judge to give the instruction; (2) "the [absence of the instruction] by itself so infected the entire trial that the resulting conviction violate[d] due process"; and (3) the state court's contrary finding on steps one and two does not survive scrutiny under the deferential standard articulated in § 2254(d).  *Davis v. Strack*, 270 F.3d 111, 123–24 (2d Cir. 2001).  Magistrate Judge Maas did not reach the second and third elements of Hubrecht's claim because he concluded that New York law did not require the trial judge to give an instruction.  The Court concurs with that conclusion.

Under New York law, "[i]n order to be entitled to a justification instruction, a defendant must show both that he subjectively believed that deadly force was necessary under the circumstances and that a reasonable person in his situation would have held this belief."  *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (citing *People v. Goetz*, 68 N.Y.2d 96, 115 (1986)).  "Even if a defendant reasonably believed that deadly force was necessary, his actions were not justified if he knew that he could, with complete safety, avoid using deadly force by retreating."  *Id*. (citing N.Y. Penal Law § 35.15(2)(a)).  If a justification instruction is given, the People bear the burden of disproving justification beyond a reasonable doubt.  *See* N.Y. Penal Law §§ 25.00(1), 35.00; *People v. McManus*, 67 N.Y.2d 541, 546–47 (N.Y. 1986) ("[W]henever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged.").  The trial court is required to give the

instruction, however, only if there "exist[s] a reasonable view of the evidence from which a jury could conclude that the defendant's acts were justified." *Blazic*, 900 F.2d at 540. The showing is minimal, and the trial court must view the evidence in the light most favorable to the defendant, drawing all permissible inferences in the defendant's favor. *Davis*, 270 F.3d at 125; *People v. Watts*, 442 N.E.2d 1188, 1189 (N.Y. 1982). But the "court is not required to adopt an artificial or irrational view of the evidence in deciding whether a justification charge is warranted." *Blazic*, 900 F.2d at 540.

On the particular facts of this case, the state trial court would have been required to instruct the jury on justification if a reasonable view of the evidence supported the inferences that: (1) at the time of the shooting, Hubrecht actually believed that Kenna was about to attack him with a hammer and that deadly force was necessary to avoid the attack; (2) a reasonable person in Hubrecht's position, taking into account the history of Hubrecht's relationship with Kenna, would also have concluded that deadly force was necessary; and (3) Hubrecht did not have an obligation to retreat. But, although Hubrecht might have subjectively believed that deadly force was necessary to protect himself from Kenna, there was insufficient evidence at trial to find that Hubrecht's action was also objectively reasonable. In addition, there was no evidence that Hubrecht lacked the ability to retreat into his apartment.

The central problem with Hubrecht's justification defense is the paucity of evidence regarding what actually occurred on the morning of September 11, 2000. As the New York Appellate Division accurately put it, "[t]here was no admissible evidence supporting [Hubrecht's] assertion that the deceased attacked him with a hammer, and this claim rests on speculation." *Hubrecht*, 769 N.Y.S.2d at 37. Hubrecht did not testify at trial, and there were no other eyewitnesses to the altercation between him and Kenna. While direct evidence of what

transpired is not necessary for a justification instruction, the circumstantial evidence must be sufficient to raise a rational inference that Kenna's actions would have led a reasonable person in Hubrecht's position to believe deadly force was necessary to defend himself.  *See Blazic*, 900 F.2d at 540.  But the only circumstantial evidence here is forensic evidence regarding the positioning of Kenna's body when the shots were fired and the presence of a hammer in Kenna's hand when the police arrived.  Viewed in a light most favorable to Hubrecht, a jury could have inferred from the forensic evidence that Kenna was within two feet of Hubrecht when the shots were fired.  It also could have inferred that Kenna held a hammer in her hand when she called on Hubrecht, and that for at least two of the shots, Kenna's right hand was at her side.

This evidence is inadequate to support a justification instruction because further inferences would simply not be rational.  True, it is theoretically possible for Hubrecht to have fired the first shot after Kenna had raised the hammer in a threatening motion, at close range, with her left hand.  But, on the evidence presented, this is purely speculative.  It is also possible that Hubrecht heard Kenna knocking on his door, recognized her voice, grabbed his gun, and shot her immediately after opening the door.  Perhaps he moved the gun forward, closer to her body, before firing, and perhaps Kenna reached for her hammer reflexively in an attempt to defend herself.  Or maybe Hubrecht shot Kenna after the two argued at his doorstep, then placed the hammer in her hand to concoct a justification defense for himself.  These are just three possibilities, among numerous others, that a jury could conjure up if it were invited to speculate.

While it is the jury's province to determine whether, based on each juror's personal experience and knowledge, one scenario is more likely than another, it was the state court's task to determine whether such a balancing of probabilities was even rationally possible in light of the evidence.  *See Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975) (holding that under New

York law, "[i]f the circumstantial evidence presented lends itself equally to several conflicting inferences, the trier of fact is not permitted to select the inference it prefers, since to do so would be the equivalent of engaging in pure speculation about the facts"); *Perez v. Greiner*, 01 Civ. 7140 (HB), 2003 WL 21203351, at *5 (S.D.N.Y. May 21, 2003) ("[A] justification defense requires a sufficient evidentiary predicate.").  Here, there is simply no evidence to support Hubrecht's view of what actually happened that morning, leaving the jury to speculate.[2]  There is no evidence that Kenna lunged at Hubrecht with the hammer in her hand or verbally threatened to kill him on the morning in question.  A jury would have no rational basis for finding that Kenna made a single threatening gesture or word to Hubrecht that morning.  The only thing it could have rationally inferred is that Hubrecht opened his door to see a 69-year-old woman standing a few feet away with a hammer in her hand.  As a matter of law, it was not reasonable for a man in Hubrecht's position to decide at that moment that his life was in danger and that deadly force was required to save it.  *See People v. Grady*, 838 N.Y.S.2d 207, 212, 213 (N.Y. App. Div. 2007) (holding that "the jury could not rationally conclude that [the defendant's] reactions were those of a reasonable man acting in self defense" when the two victims—police officers—"had not drawn their weapons"); *Perez*, 2003 WL 21203351, at *5 (holding that mere possession of a gun, without more, was insufficient to raise the inference that victim was the initial aggressor); *Watts*, 442 N.E.2d at 1190 (holding that defendant's statement that victim "came after [defendant] in his room with a kitchen knife," standing alone, "provides no basis for determining that he was in imminent danger of being subjected to deadly physical force"); *cf. People v. Steele*, 26 N.Y.2d 526, 528–29 (N.Y. 1970) (finding that a justification charge should

---

[2] Hubrecht was under no obligation to testify.  Therefore his decision not to do so "did not disentitle him to a justification charge." *People v. Grady*, 838 N.Y.S.2d 207, 212 n.1 (N.Y. App. Div. 2007).  Rather, as in *Grady*, the court's denial of a justification charge "was compelled by the absence of any reasonable view of the evidence which would support such a defense." *Id.*

have been given where even the prosecutor admitted that the victim had instigated the fight and was shot only after lunging with a knife at the defendant). As the state trial judge remarked when he denied Hubrecht's request for the instruction, "the jury [cannot] evaluate what's going on without some additional evidence as to what occurred during the encounter." (Tr. at 3001.) Allowing the jury to so evaluate would be "unreasonable and calls for too much speculation . . . ." (*Id.*)

Hubrecht argues that the history of his unhappy relationship with Kenna constitutes "additional evidence" that would have permitted the jury to rationally infer facts sufficient for a justification instruction. This evidence, the argument goes, would have permitted the jury to infer that Kenna took specific actions that morning, and that a reasonable person with Hubrecht's physical and mental state would have interpreted those actions as a threat on his life. But the evidence does not permit these inferences because a fact-finder cannot infer conduct on one occasion from conduct on previous occasions except in limited circumstances not present here.

In New York, courts do not admit evidence for the purpose of inferring conduct on a particular occasion from past instances of such conduct except when the evidence demonstrates that the conduct constituted a "habit" or "routine practice." *See Rivera v. Anilesh*, 8 N.Y.3d 627, 634 (N.Y. 2007) ("The applicability of this doctrine is limited to cases where the proof demonstrates 'a deliberate and repetitive practice' by a person 'in complete control of the circumstances' as opposed to 'conduct however frequent yet likely to vary from time to time depending upon the surrounding circumstances.'") (internal citations omitted). Here, there is absolutely no evidence that Kenna habitually confronted Hubrecht at his door and physically threatened him with a weapon. Evidence that Kenna hit him with a magazine on one occasion (Tr. at 2386) and waved her hammer in a threatening manner (*id.* at 1869, 1886–87) on another is

not evidence of habit.  At best, the history of Hubrecht and Kenna's relationship supports the inference that Kenna routinely complained about Hubrecht's behavior in an aggressive but non-violent manner.

Indeed, none of Kenna's prior conduct amounted to a specific threat of physical harm. *Cf. People v. Petty*, 852 N.E.2d 1155, 1161 (N.Y. 2006) (affirming rule that "evidence of a deceased victim's prior threats against defendant is admissible to prove that the victim was the initial aggressor").  Relying on *Davis v. Strack*, Hubrecht argues otherwise.  It is true that in *Davis* the petitioner had been convicted for shooting someone with whom he had a history of animosity.  But the similarities between that case and this one end there.  In *Davis*, the decedent, inaptly named Bubblegum, was "a six foot tall, 435-pound felon . . . [who] had robbed [the petitioner] at gun point three times, forced him to strip naked twice, raped him once, once urged his co-assailant to shoot [the petitioner], and at their last meeting, after raping him, promised to kill [the petitioner] when he next saw him." *Davis*, 270 F.3d at 129.  Bubblegum had physically, and quite violently, attacked the *Davis* petitioner in the past and had specifically threatened to kill him on their next encounter.  In Hubrecht's case, there was no violent history between the defendant and Kenna.  Nothing suggests that she ever threatened to kill Hubrecht—let alone that she made a threat as credible as Bubblegum's surely was.

Not only did Bubblegum have a history of violently attacking and threatening the defendant; the circumstances immediately preceding his death would also have strongly suggested to any reasonable person in the *Davis* petitioner's position that he was in imminent danger.  Ample eyewitness testimony at trial demonstrated that Bubblegum had been "visibly high on drugs" at the time of the killing; that he had followed the petitioner; and that, after stopping to say something to a woman, he had turned to face the petitioner while reaching for his

waistband.  *Id.* at 129–30.  The jury could have used the violent history between the two as a lens through which to assess the petitioner's response to Bubblegum's actions.  *See Goetz*, 68 N.Y.2d at 113 (knowledge of "prior acts of violence" by the deceased "would be relevant on the issue of reasonableness, as the jury must consider the circumstances a defendant found himself in, which would include any relevant knowledge of the nature of persons confronting him").  While a stranger who saw Bubblegum reach for his waistband might not have perceived anything threatening in this gesture, the petitioner knew Bubblegum carried a gun, had threatened to kill him when they next met, and had followed through on violent threats in the past.

Unlike in *Davis*, where there was substantial evidence that the petitioner had acted in self-defense—the decedent, who routinely carried a gun and had a history of violence, was reaching for his waistband while high on drugs when the petitioner shot him—no such evidence was presented at Hubrecht's trial.  True, Hubrecht and Kenna had bad blood between them, but that history means little in the absence of evidence about what Kenna did on the morning of September 11, 2000, once she showed up at Hubrecht's door.  Hubrecht argues that the sight of Kenna with a hammer in her hand was enough to induce a reasonable person in his position to feel his life was threatened.  He tries to bolster this claim by pointing to his frail health after treatment for cancer (Trial Tr. at 2240, 2272–73), and arguing that a reasonable person who was that weak would have seen no other way to defend himself.  Under New York law, however, this is just not enough.  *See, e.g.*, *Watts*, 442 N.E.2d at 1190 (without more, the statement that decedent came after the defendant in his room with a knife was insufficient to establish the objective reasonableness of the defendant's use of force); *Perez*, 2003 WL 21203351, at *5.  A reasonable person in Hubrecht's position, even in frail health, would not have believed his life to be in imminent danger on opening his apartment door to a five-foot-three, sixty-nine-year-old

18

woman, even if she were holding a hammer in her hand.

Hubrecht also highlights the letter ADT sent to Kenna just days before the shooting, which alerted her to Hubrecht's request for the records of her alarm system; he argues that a reasonable person would have expected Kenna to react violently to that news.  But there is no reason to think Kenna would have reacted differently to that letter than she did to all of the other intrusions she perceived Hubrecht to have made into her apartment during the previous thirty years.  A reasonable person with an acrimonious but non-violent relationship with Kenna would not have instantly perceived her appearance at his door with a hammer in her hand as life-threatening.  *See Watts*, 442 N.E.2d at 1190; *Grady*, 838 N.Y.S.2d at 211–13; *Perez*, 2003 WL 21203351, at *5.

The Court notes that Hubrecht's claim also fails because there was insufficient evidence to raise the inference that he had no duty to retreat.  *See White v. Fischer*, 04 Civ. 5358, 2008 WL 4210478, at *8 (S.D.N.Y. Sept. 12, 2008) (to prove the justification defense, defendant "had to present evidence that he could not have retreated safely."); *People v. Counts*, 214 A.D.2d 897, 898 (N.Y. App. Div. 1995) (justification defense not required where there was "no record evidence to indicate that defendant attempted to retreat or that he was unable to do so with complete safety to himself").  It is theoretically possible, of course, that Hubrecht came into the hallway and closed the door behind him only to be pinned against it by Kenna.  (In that event, Hubrecht would have had to have exited his apartment with a gun and then closed the door behind him.)  But it is just as possible that Kenna was standing several feet from the doorway while Hubrecht stood in the doorway, having opened his door enough to see her.  (In that case, too, Hubrecht would have had the gun in his possession from the beginning, unless he then asked Kenna to wait while he retrieved it.)  In the first scenario, Hubrecht likely would not have had a

duty to retreat; in the second, he probably would have.  *See People v. Aiken*, 4 N.Y.3d 324, 329–30 (N.Y. 2005) (holding that a person standing in the doorway to his apartment has a duty to retreat to avoid a violent encounter).[3]  These scenarios, along with many others the Court could conjure up, are equally speculative.  There is simply no evidence in the record from which a reasonable jury could infer that one was more likely than another.  Also, to the extent Hubrecht intends to argue that the duty to retreat, unlike the decision to use deadly force, depends only on the defendant's subjective state of mind and not also that of a reasonable person, he misreads New York case law.  *See People v. Huse*, 554 N.Y.S.2d 579, 580 (N.Y. App. Div. 1990) (expressly rejecting the argument).  In *People v. Lopez*, 607 N.Y.S.2d 368 (N.Y. App. Div. 1994), the case cited by Hubrecht, the court recognized that the test was not purely objective—i.e., had both objective and subjective components—not that it was purely subjective.  *Id.* at 369.

Because the petitioner has not demonstrated that the trial court erred in refusing to give a justification charge to the jury, he "cannot carry the heavier burden of establishing a violation of constitutional due process."  *Evans v. Artuz*, 68 F. Supp. 2d 188, 197 (ED.N.Y. 1999).  Accordingly, Hubrecht's claim is denied.

## III.     The Evidentiary Rulings

Hubrecht's other objections to the Report are that the trial court erroneously refused to admit (1) certain documents from Kenna's luggage cart and (2) hearsay statements the defense

---

[3] Hubrecht tries to distinguish this case from *Aiken* because in that case, Aiken did not own the entire building, whereas Hubrecht did.  This is true but immaterial to *Aiken*'s rationale.  A person has no duty to retreat once inside his own "dwelling."  *Aiken*, 4 N.Y.3d at 328.  In *Aiken*, the court held that the doorway between a person's apartment and a common hallway is not part of his dwelling; instead it is a hybrid space, joining the apartment (a private space) with the hallway (a public one).  *Id.* at 330.  In the same way, the common hallway in Hubrecht's multi-unit building was public, at least to other tenants of the building.  Thus it cannot be fairly said that the hallway or doorway in Hubrecht's building was part of his own home.

wanted to use to cure a misimpression allegedly created by the prosecution.  The documents in
Kenna's cart—diary and calendar entries, "counter surveillance" materials, and legal
correspondence—relate to Hubrecht and Kenna's antagonistic relationship.  In addition, one of
the documents contained the statement "the paths of glory lead but to the grave" above
Hubrecht's name.

The hearsay statements that the defense sought to introduce were made by Hubrecht to
the 911 operator on the day of the shooting and to officers at the police station after he was
arrested.  In these statements, Hubrecht clearly claimed that he had acted in self-defense.
Although admission of the statements would ordinarily be barred as hearsay, Hubrecht argues
that they should have been admitted to correct what it says was a misimpression that the
prosecution created.  This, Hubrecht says, was the prosecution's false insinuation at trial that he
never claimed, on the day of the shooting, to have acted in self-defense.  The petitioner gives two
examples.  First, when the prosecutor questioned Benny, the EMT on the scene, he asked Benny
not only whether Hubrecht had admitted to shooting Kenna (he had), but also whether Hubrecht
had indicated "anything else about what had happened" during the pair's initial conversation
outside Hubrecht's building.[4]  (Trial Tr. at 384–85.)  The defense objected to this exchange,
arguing that it invited the jury to believe that Hubrecht had not asserted self-defense on the day
of the shooting.  The objection was denied.  Second, the prosecutor put on the stand two of the
police officers who had arrived on the scene of the crime and asked each of them whether
Hubrecht that day had claimed to have shot Kenna in self-defense.  In both cases, the trial court
sustained a defense objection.  But the trial court consistently refused to allow Hubrecht to put

---

[4] Benny testified that Hubrecht did not tell Benny anything else during the conversation outside
Hubrecht's building.  (Tr. 387.)  But he also testified that, once he began walking upstairs to the
victim, Hubrecht told Benny that he "had psychiatric problems" and "takes medication."  (*Id.*
388.)

into evidence the statements he had made, to a 911 operator and to the police.  Hubrecht now argues that the exclusion of this evidence deprived him of his right to a fair trial under the Sixth and Fourteenth Amendments.

"Due process requires the state courts in conducting criminal trials to proceed consistently with that fundamental fairness which is essential to the very concept of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotation marks omitted).  But this right is not limitless.  "Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right to present a meaningful defense." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) (internal quotation marks omitted).  A ruling to exclude evidence is only "an error of constitutional dimension," *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988), if "the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist." *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (internal citations and alterations omitted).  The basic question is whether the trial court's error was a harmless one. *Rosario*, 839 F.2d at 924.  A trial court's exclusion of evidence that was cumulative or irrelevant cannot violate a petitioner's right to a fair trial because admission of the evidence would not have affected the outcome.

The trial court's exclusion of the documents in Kenna's luggage cart was not error, let alone error of a constitutional dimension, because those documents were effectively irrelevant to Hubrecht's self-defense theory.  To be sure, they provided further evidence of Hubrecht and Kenna's antagonistic relationship.  But evidence of an antagonistic relationship says nothing about how Kenna actually behaved on the morning of September 11, 2000.  The documents provided cumulative background evidence, and the trial court acted well within its discretion in excluding them. *See Blissett v. Lefevre*, 924 F.2d 434, 439 (2d Cir. 1991).  Hubrecht argues that

at least one document is evidence of a clear threat to harm Hubrecht: a diary entry, dated October 16, 1994, that contains four names, including Hubrecht's, beneath the words "the paths of glory lead but to the grave." This phrase, taken from Thomas Gray's poem "An Elegy Written in a County Churchyard," is hardly a direct threat of imminent violence against Hubrecht. *Cf. Petty*, 852 N.E.2d at 1159, 1162 (allowing inference only when victim, in the 11 days leading up to the incident, "repeatedly threatened to kill defendant"). To the contrary; if the entry's date is to be believed, it was drafted nearly six years before the shooting. The connection between this diary entry and the events of September 11, 2000, is tenuous at best, and the trial court was within its discretion in excluding the document.

The trial court similarly acted within its discretion in refusing to admit statements made by Hubrecht on the day of the shooting. Hubrecht contends that the prosecution falsely implied that he did not assert self-defense until later than the day of the shooting, and that it violated his due process right to a fair trial not to admit out-of-court statements that would have refuted that misimpression. But the prosecution did not create the impression Hubrecht claims it did. First, the colloquy with Benny, the EMT, was unproblematic. Benny was not privy to Hubrecht's assertions that he acted in self-defense, and there was nothing misleading in asking him to recount what Hubrecht had said to him when Benny first arrived at Hubrecht's building. Nor was it misleading to ask whether Benny had testified to "the complete conversation that was had between you and this man in front at that time." (Trial Tr. at 387.) Without more, this answer suggested nothing about whether Hubrecht had asserted self-defense at all on the day of the shooting. At most, it proved that Hubrecht had not done so in his very brief conversation with Benny. In addition, the prosecution never argued, in opening or summation, that Hubrecht had

failed to assert self-defense on the day of the shooting.[5]

The questions to the two police officers were, as Judge Maas acknowledged in his Report, less benign.  The prosecutor expressly asked Sergeant Henry whether "the defendant said to you I shot her because she had a hammer."  (*Id.* at 749.)  The defense's objection to this question was sustained.  Later, the prosecutor asked Officer Wong—another early arriver on the scene on September 11, 2000—the same question.  (*Id.* at 886.)  Again the defense objected, and again the objection was sustained.  Further, after the question to Wong, the trial court issued a curative instruction to the jury:

> [W]hen I sustain an objection to a question . . . the question is not proper in my view under the rules of evidence.  Any answer that is given has to be disregarded.  The question itself is never evidence.  In fact nothing that the attorneys say themselves is evidence.

(*Id.* at 891–92.)  The Supreme Court has said that it "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant."  *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal citation omitted); *see CSX Transp., Inc. v. Hensley*, 129 S.Ct. 2139, 2141 (2009) ("[J]uries are presumed to follow the court's instructions."); *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (quoting *Greer* for the

---

[5] In summation, government counsel came close when he said: "Now, questions were asked of witnesses about did they hear anything about self-defense?  Did you hear anything over the 911 about self-defense.  Dr. Hughes talked about perceiving a threat.  [Defense counsel] told you in opening statement that you should find that he was justified because of this threat."  (Tr. 3185.)  Before the prosecution could say anything else, however, defense counsel objected and asked for a sidebar.  At the sidebar, defense counsel pointed out that, given the court's refusal to give a justification charge, the government should not be permitted to allude to the justification defense.  The court agreed, and after the sidebar gave an instruction to the jury: "I'm specifically instructing you and you will find out that that's not a defense that you will be permitted to consider in this case. . . . [T]he specific defense of self-defense known as justification under our law will not be a defense that you may consider in this case."  (Tr. 3190–91.)

same proposition). Here, neither officer was allowed to answer the prosecutor's question. Nor was the prosecutor permitted to argue, in opening or closing, that Hubrecht had failed to raise self-defense until sometime after the shooting. In these circumstances, it was not "overwhelmingly probable" that the jurors were unable to follow the court's instructions; nor was it very likely that the prosecutors' questions had a devastating effect on Hubrecht's case. Thus the Court will follow the usual presumption here. The instruction had curative value, and the jury was not left with the misimpression that Hubrecht never asserted self-defense on the day of September 11, 2000. Thus there was no due process violation in the trial court's excluding Hubrecht's out-of-court statements to police officers and a 911 operator.

## CONCLUSION

For the reasons stated above, the Court denies Hubrecht's petition for a writ of habeas corpus. Because the Court does not find that reasonable jurists could disagree as to its findings, the Court also denies Hubrecht's request for a certificate of appealability.

SO ORDERED.

Dated: New York, New York
      August **11**, 2010

Richard J. Holwell
United States District Judge